

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-07-00299-CV

DAIMLERCHRYSLER MOTORS
COMPANY, LLC

APPELLANT
AND APPELLEE

V.

TOMMY J. MANUEL, TOMMY
MANUEL AUTO LEASING, INC.,
AND MANUEL AUTO SALES, LTD.

APPELLEES
AND APPELLANTS

----------

## FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. INTRODUCTION

Following a bench trial in this breach of contract case, the trial court rendered judgment for damages against Appellant and Cross-Appellee DaimlerChrysler Motors Company, LLC (Chrysler) and in favor of Appellees and Cross-Appellants Tommy J. Manuel, Tommy Manuel Auto Leasing, Inc., and Manuel Auto Sales, Ltd. (collectively, Manuel) but denied recovery of Manuel's

attorney's fees.[1]  In four issues, Chrysler contends (1) that the best efforts provision in its contract with Manuel is unenforceable or that Chrysler conclusively proved that it complied with the best efforts provision by ultimately settling a protest by a competing dealer of Manuel's application for a new dealership, (2) that Manuel's damages from delay in opening the new dealership are consequential damages barred by limitation-of-damages provisions in the parties' contracts, (3) that the trial court abused its discretion by admitting unreliable expert testimony regarding damages for lost profits, and (4) that the trial court erred in calculating prejudgment interest.  In his cross-appeal, Manuel contends that the trial court erred by failing to award him any trial and appellate attorney's fees.  We affirm in part and reverse and remand in part.

## II.  BACKGROUND[2]

Chrysler manufactures Chrysler, Dodge, Dodge Truck, and Jeep motor vehicles.  Tommy Manuel has been a franchised automobile dealer in the Dallas-

---

[1]Tommy J. Manuel; Tommy Manuel Chrysler-Jeep, Inc.; and Manuel Dodge, Ltd. were plaintiffs in the trial court.  During the pendency of this appeal, Tommy Manuel Chrysler-Jeep, Inc. changed its name to Tommy Manuel Auto Leasing, Inc., and Manuel Dodge, Ltd. changed its name to Manuel Auto Sales, Ltd.

[2]The trial court made extensive findings of fact—twenty-nine pages' worth. Findings of fact that are unchallenged are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.  *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. denied).  We draw the bulk of the facts recited below from the trial court's unchallenged findings, which from our review of the record are supported by sufficient evidence.

Fort Worth area for forty-seven years, including twenty-five years as a franchised Chrysler and Dodge dealer in Fort Worth and Richardson. At the time of trial, Tommy Manuel owned or controlled at least nine motor vehicle dealerships in the Dallas-Fort Worth market.

## A. Historical Backdrop

In the mid-1990s, as number three of the "Big Three" in that day, Chrysler developed a market realignment plan called "Project 2000" to reorganize, relocate, and establish more motor vehicle dealerships to improve sales in the Dallas-Fort Worth area and to better compete with its rivals, Ford and General Motors. As an essential part of Project 2000, Chrysler sought to have its various Dallas-Fort Worth franchised dealers agree to waive their rights to protest the establishment or relocation of other dealerships in the Dallas-Fort Worth area.

Texas and other states closely regulate the distribution and sale of automobiles. In response to the superiority of economic power and bargaining strength of American automobile manufacturers in their relationships with dealers that had developed by the 1950s, with dealers completely dependent upon those manufacturers for their supply of automobiles, Congress[3] and state legislatures enacted regulatory schemes to protect retail dealers from perceived abusive and

---

[3]*See* Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1956).

3

oppressive acts by the manufacturers.[4]  In accord with the policy of protecting dealers and consumers, the United States Supreme Court upheld the constitutionality of a California statute that prohibited manufacturers from relocating or adding new dealerships to their market areas where the effect of such added competition would be injurious to existing franchisees and to the public interest.[5]  The Court held that a state may, consistent with due process, provide that the filing of a protest by an existing dealer can, without a prior hearing, prevent another dealer from relocating or establishing a new dealership in the existing dealer's defined market area until after a hearing and resolution of the protest.[6]

The Texas Motor Vehicle Commission Code (TMVC), this State's first regulation of the motor vehicle manufacturer-dealer relationship, was adopted in 1971.[7]  The policy of the TMVC, set forth in what is now section 2301.001 of the

---

[4]*See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 101–02 & n.5, 99 S. Ct. 403, 407–08 & n.5 (1978) (listing then-existing federal and state statutes and quoting from Senate committee report as to its grave concern that the disparity in economic power and bargaining strength had enabled manufacturers to, in effect, write the rules by which the two parties conduct their business affairs as set forth in the sales agreements or franchises that the manufacturer prepares for the dealer's signature) (quoting S. Rep. No. 84-2073, at 2 (1956)).

[5]*Id.* at 107–08, 99 S. Ct. at 410–11.

[6]*Id.*

[7]*See* Act of April 7, 1971, 62nd Leg., R.S., ch. 51, 1971 Tex. Gen. Laws 89.  The TMVC has been amended almost every session since its inception. Currently, the regulatory function is performed by the Motor Vehicle Division of

4

occupations code, is to ensure a sound system of distribution and sale of motor vehicles for the protection of the public interest and welfare of the citizens of Texas through exercise of this State's police power.[8]

The TMVC, as do similar state statutory schemes like California's, provides a procedure by which an existing dealer may protest the establishment or relocation of a dealership that will sell the same line or make of vehicles in the same county or within fifteen miles of the existing dealership.[9] The filing of a notice of protest triggers an administrative proceeding requiring a hearing before the Commission, in which the applicant for the new dealership has the burden to establish "good cause" for establishing or relocating the dealership at the proposed location.[10] In the meantime, filing of the notice effects an immediate statutory stay as to any action by the applicant to establish or relocate the proposed new dealership or relocation until the protest is resolved.[11] Among its findings of fact, the trial court found that a hearing and final resolution of the

---

the Texas Department of Transportation, and the substantive law is now codified as Chapter 2301 of the Texas Occupations Code. *See, e.g.,* Tex. Occ. Code § 2301.001 (West 2004). Current sections of the occupations code referenced in this opinion correspond to sections of the former TMVC in effect at the time of the events and suit that remain substantially unchanged.

[8]*See id.*

[9]*See* Tex. Occ. Code Ann. § 2301.652 (West Supp. 2011).

[10]*Id.*

[11]*See id.* § 2301.803 (West Supp. 2011).

protest could take years. Complicating matters in this case, the TMVC provides that any agreement waiving terms of the TMVC is void and unenforceable.[12]

## B. Project 2000

By mid-July of 1999, after several years of efforts to obtain agreements for the realignment of the Dallas-Fort Worth market from its various dealers in the area, Chrysler had circulated and obtained settlement agreements, including waivers of the right to protest, from each of the Dallas-Fort Worth area dealers participating in Project 2000, with the exception of Manuel. Manuel was aware of Chrysler's plan but was not originally a Project 2000 participant for several reasons. Chrysler had litigation pending against one of Manuel's dealerships (and other dealerships in Texas and California) for allegedly seeking fraudulent warranty credits from Chrysler for engine cores (the *Cores* litigation), and Manuel had a protest against Chrysler pending before the Commission arising out of the *Cores* litigation. Additionally, Manuel had bought and operated for twenty-five years a successful dealership in Richardson with a "trip," that is, three lines—Chrysler, Dodge car, and Dodge truck. Chrysler had been trying to buy the Chrysler line from Manuel for many years, and he had refused to sell it. Chrysler desired the Chrysler line to keep Manuel from protesting other dealers in that market area as well as to give that "point" to another dealer to complete the Project 2000 market realignment. Chrysler approached Manuel last

---

[12]*See id.* § 2301.003 (West 2004).

6

regarding Project 2000 because it knew that Manuel would be the most expensive to deal with. Joe Park, Chrysler's Dallas zone manager at the time, recalled at trial, "We had to get him out of the way."

In mid-August 1999, during a meeting of Dodge truck dealers in San Antonio, Chrysler representatives from Detroit and the Dallas zone office met with Manuel about joining Project 2000, and the parties proceeded to negotiate. Chrysler offered Manuel $5 million for his Chrysler line at the Richardson dealership, and Manuel bargained for $15 million and another dealership to replace it. The parties discussed possible locations for an additional dealership, and Park told Manuel that the other dealers had signed waivers of the right to protest relocations or additional dealerships in joining Project 2000. By the end of August 1999, the two parties had arrived at a comprehensive agreement.

## C. The Agreements

Manuel signed two written agreements dated August 31, 1999, after reviewing them with his attorney (who had represented him in the *Cores* litigation). One was a settlement and release agreement (the Settlement Agreement) similar to those entered into with the other dealers participating in Project 2000. Pursuant to the Settlement Agreement, Chrysler paid Manuel $15.34 million to settle the *Cores* litigation, to relinquish the Chrysler line at his Richardson dealership, and to waive any right to protest the other dealers involved in Project 2000. The second agreement, attached to and referenced in the Settlement Agreement, was titled "Agreement to Enter into Sales and Service

7

Agreement" (the AESSA). By the AESSA, Chrysler agreed to enter into a franchise agreement with Manuel for a new Chrysler-Jeep dealership in South Arlington (the South Arlington dealership), conditioned upon Manuel providing the land, building the facility, and furnishing the capital investment for the new dealership by January 1, 2001.

The Settlement Agreement stated that the South Arlington dealership was "subject to the possibility that it may be protested" by another dealer and that a protest "can significantly delay the establishment or relocation of the dealership subject to the protest." The AESSA in turn provided that, in the event of a protest against the South Arlington dealership, Chrysler would "use its best efforts to litigate or settle the protest or lawsuit in order to allow the establishment of [the South Arlington] dealership."

Pursuant to the terms of the Settlement Agreement, Manuel ceased selling Chrysler vehicles at his Richardson dealership within thirty days after the agreements were signed in August 1999. As required by the AESSA, Manuel created a new corporation (Tommy Manuel Chrysler-Jeep, Inc.) and filed his application with the Commission for the new dealership in South Arlington in December, which was approved on January 14, 2000. Manuel purchased property for the South Arlington dealership in April 2000.

**D. Meador's Protest**

On January 28, 2000, Meador Chrysler-Plymouth, Inc. (Meador), one of the other dealerships that was part of Project 2000 and whose dealer-principal

had signed a protest waiver, filed a notice of protest against the creation of the South Arlington dealership, which would be located less than fifteen miles from Meador's existing dealership. The filing of Meador's protest was unexpected by both Manuel and Chrysler, and it triggered the statutory stay of Manuel's attempts to open the South Arlington dealership.

Chrysler's zone manager and other representatives met with Mr. Meador and his business associate on a number of occasions, requesting that Meador withdraw its protest. Chrysler moved to have the protest dismissed by the Commission, acting as Meador's attorney-in-fact as provided by Meador's settlement agreement. Failing that effort, on March 31, 2000, Chrysler filed suit in federal district court in the Western District of Texas, obtained a stay of the administrative proceeding, and sought injunctive relief and to compel arbitration of the issues raised by Meador's protest. The federal court initially stayed the state administrative proceeding but, after a hearing, denied all relief on June 7, 2000, abated the suit in its own court, and returned the protest to the Commission for resolution. Chrysler then sought and obtained permission to file an interlocutory appeal of the adverse ruling and intervened in the administrative proceeding before the Commission. In July 2000, Chrysler filed its appeal to the Fifth Circuit Court of Appeals from the federal district court's adverse decision. Also in July of 2000, pursuant to a strategy agreed upon at a meeting between Manuel and Chrysler and their respective attorneys, Manuel filed a separate suit

in state court against Meador for damages resulting from the delay of the establishment of his new dealership caused by Meador's protest.

In September 2000, some eight months after the protest had been filed, Chrysler had intensive settlement negotiations with Meador. Chrysler ultimately settled the Meador protest in October 2000 by giving Meador a letter of intent for an additional dealership and paying Meador $17,000 in attorney's fees. In November 2000, Chrysler advised Manuel to proceed with building his facility for the new dealership in South Arlington, and the Meador protest was formally dismissed on December 21, 2000.

## E. This Suit

It was undisputed that the years 2000 and 2001 were exceptionally good years for car sales in the Dallas-Fort Worth market, but Manuel was not able to complete and open the South Arlington dealership until February 2002. A significant downturn in sales and a steep decline of the American market share of automobiles began in 2002. They were continuing at the time of trial, and the new dealership sustained a loss for 2002 and subsequent years.

In 2004, Manuel sued Chrysler for breach of contract and other causes of action, seeking damages caused by the delay in opening the South Arlington dealership as the result of Chrysler's failure to resolve Meador's protest, the costs Manuel incurred in litigating Meador's protest before the state agency and in state court, and attorney's fees. Manuel contended that Chrysler failed to use

its best efforts as required by the AESSA to litigate or settle the Meador protest, thereby causing the delay in the opening of the South Arlington dealership.

The trial court granted summary judgments to Chrysler on most of Manuel's causes of action, including breach of contract, but on the morning of trial on damages, the trial judge announced during opening statements that he would hear evidence regarding breach of the best efforts clause by Chrysler. The parties tried the case to the bench over a sporadic period of about six weeks regarding that issue and damages. Among its findings of fact, the trial court found that Chrysler failed to use its best efforts to resolve the Meador protest and that Chrysler "breached the contract."[13] The trial court rendered a final judgment awarding Manuel $370,668.50 in damages plus prejudgment interest but denied Manuel recovery of attorney's fees. Both parties appealed. Chrysler seeks reversal of the trial court's judgment and rendition of a take-nothing judgment, and Manuel seeks remand for a new trial on the issue of attorney's fees.

### III.  BEST EFFORTS

By its first issue, Chrysler argues that the AESSA's best efforts clause is unenforceable because it lacks measurable goals and guidelines and that even if the best efforts clause is enforceable, the goal of the agreement was the opening of the South Arlington dealership, meaning best efforts are irrelevant because

---

[13]The trial court's findings of fact and conclusions of law do not expressly state that Chrysler breached the AESSA (as opposed to the Settlement Agreement), but only the AESSA contains a best efforts clause.

that goal was ultimately met. Chrysler alternatively contends that the evidence conclusively established that Chrysler used its best efforts to resolve the Meador protest.[14]

## A. Enforceability of "Best Efforts" Clause

### 1. Standard of Review

When a contract is unambiguous, interpretation of the written instrument is a question of law for the court. *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)); *see Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 809–10 (Tex. App.—Fort Worth 2006, pet. denied) ("The interpretation of an unambiguous contract is a question of law, which we review de novo."). More specifically, the enforceability of a contract is a legal issue that we review de novo. *See Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*, 301 S.W.3d 747, 754 (Tex. App.—El Paso 2009, pet. denied); *Chavez v. McNeely*, 287 S.W.3d 840, 843–44 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

### 2. Goals and guidelines

---

[14]Manuel urges us to summarily overrule Chrysler's first issue, arguing that an independent basis exists for the judgment in that the trial court could have based its breach of contract finding on breach of paragraph 3 of the Settlement Agreement. But the trial court specifically found that Chrysler failed to use its best efforts to resolve the Meador protest, a provision contained only in the AESSA. The trial court had also previously granted summary judgment against Manuel for breach of the Settlement Agreement and made no finding, and none was requested, that Chrysler failed to comply with paragraph 3 of the Settlement Agreement. Thus, we will consider Chrysler's first issue on the merits.

Chrysler first argues that "best efforts" is a vague standard that is rarely held enforceable. But Chrysler's own general counsel and legal department drafted the settlement agreements and AESSAs used to implement Project 2000. Moreover, and to the contrary, courts enforce contractual best efforts clauses in a wide variety of circumstances. *See* E. Farnsworth, *Farnsworth on Contracts* § 7.17c (2d ed. 2001) (stating it is no longer the case that "a duty defined only in terms of best efforts" is too indefinite to be enforceable) (citations omitted); Kenneth A. Adams, *Understanding "Best Efforts" and Its Variants (Including Drafting Recommendations)*, 50 No. 4 Practical Lawyer, Aug. 2004, at 17 (noting courts in most jurisdictions have held best efforts clauses enforceable). "Whatever the test of best efforts, there is no question but that courts today regard the standard of best efforts—like that of good faith—as a workable standard in a variety of circumstances." E. Farnsworth, *On Trying to Keep One's Promises: The Duty of Best Efforts in Contract Law,* 46 U. Pitt. L. Rev. 1, 12 (1984).

Courts construing a best efforts provision that does not specify the performance to be required commonly hold the promisor to the standard of the diligence a reasonable person would use under the circumstances. *See, e.g., CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 578 (Tex. App.—Dallas 1991, writ denied) (op. on reh'g) (comparing performance of best efforts with that of average prudent operator in light of circumstances of case); *see also Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614–15 (2d Cir.

1979) (holding licensor could not treat licensee's brands less favorably than its own); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,* 281 N.E.2d 142, 144 (1972) (holding publisher who promised best efforts to promote author's book not restricted from also promoting competing series); Farnsworth, 46 U. Pitt. L. Rev. at 7–8 ("Best efforts is a standard that has diligence as its essence . . . .").

Chrysler, quoting from the Dallas court of appeals opinion in *CKB*, specifically complains that the best efforts clause in this case lacks measurable goals and guidelines. 809 S.W.2d at 580. In that case, CKB had agreed to use its best efforts to refine crude oil into specific volumes of refined products, as set out in the agreement in a schedule specifying percentages of total refinery output for each product. *Id.* at 578. Instead of refining the crude oil to produce the quantities specified in the contract, CKB operated the refinery to produce the highest dollar yield on the crude. *Id.* at 579, 582. Moore McCormack sued CKB for breach of contract, and the trial court rendered summary judgment in Moore McCormack's favor. *Id.* at 580. CKB appealed. *Id.*

As Chrysler points out, the *CKB* court described the provision for "best efforts" in a contract as "a nebulous standard. . . . Under some circumstances, a party could use best efforts to achieve a contractual goal and fall well short. Under different circumstances, an effort well short of one's best may suffice to hit a target." *See id.* at 581. Thus, that court reasoned, "To be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts

14

may be measured." *Id.* at 581–82 (citing *Pinnacle Books, Inc. v. Harlequin Enters.*, 519 F. Supp. 118, 121 (S.D.N.Y. 1981)). The court concluded that when sufficient guidelines exist, a party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. *Id.* at 582. Only when a party misses the guidelines would a court measure the quality of its efforts "by the circumstances of the case . . . and by comparing the party's performance with that of an average, prudent, comparable operator." *Id.* (citing *Bloor*, 601 F.2d at 613–14; *Pinnacle*, 519 F. Supp. at 122; *Arnold Prods., Inc. v. Favorite Films Corp.*, 176 F. Supp. 862, 866 (S.D.N.Y. 1959)). Ultimately, the court affirmed the summary judgment against CKB because it concluded that CKB made *no efforts* to meet the production standards specified in the contract, stating: "As a matter of law, no efforts cannot be best efforts." *Id.* (citing *Bloor*, 601 F.2d at 613–14).[15] Thus, the *CKB* court did not further explore the "goal or guideline" standard.

Chrysler argues that the best efforts clause in the AESSA is unenforceable because it fails to set forth a measurable goal or guideline in that no date was specified by which Chrysler was required to litigate or settle the Meador protest.

---

[15]As Manuel notes, other Texas courts have encountered best efforts clauses in a variety of contracts without discussion of how such a clause should be interpreted. *See, e.g., Malatt v. C&R Refrigeration*, 179 S.W.3d 152, 158 (Tex. App.—Tyler 2005, no pet.) (holding best efforts clause did not require actual sale of machine but implying reasonable time); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 233–34 (Tex. App.—San Antonio 2001, pet. denied) (interpreting Section 2.306(b) of UCC, which expressly imposes a best efforts standard upon the parties to a contract for exclusive dealing in goods).

Manuel responds that, reading the contract as a whole, the AESSA required Chrysler to settle or litigate the Meador protest in a manner that allowed Manuel to open the South Arlington dealership on or before January 1, 2001. Manuel references language in the AESSA stating that he was required to build and complete the facilities for the South Arlington dealership before January 1, 2001, that the establishment of the South Arlington dealership was of "major importance" to Chrysler, and that "time is of the essence."

In *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, the contract required Lucent to use its "reasonable best efforts" to file registration paperwork with the Securities and Exchange Commission (SEC) "as promptly as practicable" or "in the most expeditious manner practicable." 302 F.3d 552, 556 (5th Cir. 2002). Rejecting the very argument by Lucent that Chrysler makes here, the Fifth Circuit Court of Appeals held that Herrmann Holdings's pleadings stated a claim for breach of contract, significantly stating that "[r]equiring contracting parties *to fix a date certain* in order to set a temporal guideline in which to complete a certain task demands more definiteness than Texas law requires." *Id.* at 560 (emphasis added).

Here, the best efforts provision states: "[Chrysler] will use its best efforts to litigate or settle the protest or lawsuit in order to allow the establishment of [the South Arlington] dealership." The best efforts provision does not include language similar to the "as promptly as practicable" or "in the most expeditious manner practicable" language in *Herrmann Holdings*, but the AESSA does

16

specifically and expressly contemplate establishing the South Arlington dealership by January 1, 2001.[16] Even absent such language, we cannot interpret the best efforts provision as placing no deadline at all for Chrysler to litigate or settle the Meador protest because doing so reads the January 1, 2001 deadline out of the AESSA and renders the best efforts clause itself meaningless. *See id.* Rather, the goal or objective of the best efforts provision in the AESSA, in light of the agreement as a whole, was for Chrysler to use its best efforts to litigate or settle the Meador protest in such a period of time that Manuel could establish the South Arlington dealership by January 1, 2001.

Moreover, other courts have held enforceable "best efforts" requirements in contracts that contained none of the defining language in *Herrmann Holdings*. *See, e.g., First Union Nat'l Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 428–29, 433, 448 (Md. App. 2003) (holding "best efforts" is a standard in and of itself and is therefore enforceable, noting that even where "best efforts" is not defined it is "a standard that has diligence as its essence" and a term that "takes its meaning from the circumstances"); *see also Coady Corp. v. Toyota Motor Dist., Inc.*, 361 F.3d 50, 59 (1st Cir. 2004) ("'Best efforts' is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun.") (citing *Macksey v. Egan*, 633 N.E.2d 408, 413 & n.16 (Mass. App. Ct. 1994));

---

[16]That Chrysler agreed to an extension of time for Manuel to establish and open the dealership when Meador's protest was not resolved by that time is further indication that time was of the essence. *See Siderius, Inc. v. Wallace Co.*, 583 S.W.2d 852, 864 (Tex. Civ. App.—Tyler 1979, no writ).

*Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 513–14 (D. Md. 2007) (applying Maryland law and holding best efforts clause enforceable and defined in terms of reasonableness highly dependent upon surrounding circumstances); Mark P. Gergen, *The Use of Open Terms in Contract*, 92 Columbia L. Rev. 997, 1000 (1992) ("Best efforts clauses and other terms that require a party to use reasonable diligence in performance are obviously like a negligence rule.").

This is in accord with the well-established rule that, where a contract does not fix the time for performance (which is Chrysler's specific complaint about the AESSA), it will be presumed that the agreement is to be performed within a reasonable time. *Hewlett-Packard Co. v. Benchmark Elecs., Inc.,* 142 S.W.3d 554, 563 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.). What is a reasonable time depends upon the facts and circumstances as they existed at the time the contract was formed. *CherCo Props., Inc.,* 985 S.W.2d at 266. Therefore, even if the January 1, 2001 date specified in the AESSA for opening the new dealership were not controlling (and it is undisputed that the protest was not resolved in time for Manuel to build his facility and open for more than a year after that date), we hold that the best efforts provision in the AESSA had a measurable timeline or goal of resolving any protest by settlement or litigation within a reasonable time and was thus enforceable. We overrule the first part of Chrysler's first issue.

**B. The Quality of Chrysler's Efforts**

Chrysler next argues that, even if the best efforts clause is enforceable, the AESSA's only goal was the opening of the South Arlington dealership and that because Chrysler's efforts eventually settled the protest, it met the goal because the South Arlington dealership eventually opened. Thus, Chrysler, citing *Herrmann Holdings*, 302 F.3d at 559, argues that the "analysis ends" and that whether Chrysler used its best efforts is irrelevant. But the Fifth Circuit's opinion in *Herrmann Holdings* is again instructive in rejecting this argument. In that case, Lucent eventually filed the registration paperwork with the SEC, and the SEC approved the transaction. *Id.* at 557. But by that time, the Herrmanns had been damaged by the decline in Lucent's stock price. *Id.* The Fifth Circuit held that the Herrmanns had stated a plausible claim for breach of the best efforts clause; in other words, that Lucent eventually filed the paperwork and that the SEC eventually approved the transaction did not negate as a matter of law the allegations of a breach by Lucent of the best efforts clause. *Id.* at 561.

The goal of the contract here—a goal Chrysler itself identified as having major importance—was not just opening the South Arlington dealership someday, but opening the dealership by January 1, 2001. Using the *CKB* analysis, we consider the "performance . . . of an average, prudent, comparable operator" under the circumstances of the case to determine the quality of Chrysler's performance. *See* 809 S.W.2d at 582. We conclude that, even absent a date certain by which Chrysler was obligated to litigate or settle the protest, the fact that Chrysler eventually settled the Meador protest so that the

19

South Arlington dealership opened a year later than contemplated does not establish as a matter of law that Chrysler met the goal. We overrule this part of Chrysler's first issue.

## C. Legally Sufficient Evidence of Breach of Best Efforts Clause

In the final part of its first issue, Chrysler argues that, even if it missed the goal of timely resolving the protest, the evidence nevertheless conclusively establishes that it used its best efforts. Manuel responds that, under the evidence, that issue was one of fact that was properly resolved against Chrysler by the trial court as fact finder.

### 1. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228

20

S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

Whether a contractual best efforts obligation has been met or fulfilled is usually a question of fact because it is heavily dependent upon the particular circumstances of the case. *See, e.g., Mor-Cor Packaging Prods., Inc. v. Innovative Packaging Corp.*, 328 F.3d 331, 334 (7th Cir. 2003) (Posner, J.) (characterizing best efforts as a standard in and of itself and stating whether standard is met is question of fact involving "the application of a standard, 'best efforts,' to the particular facts of the case"); *Informed Physician Servs., Inc. v. Blue Cross and Blue Shield of Md., Inc.*, 711 A.2d 1330, 1342 (Md. 1998) (confirming that what constitutes reasonable efforts is largely a question of fact); *Widewaters Prop. Dev. Co. v. Katz*, 836 N.Y.S.2d 746, 748 (N.Y. App. Div. 2007) (noting that whether the obligation to use best efforts has been fulfilled will almost invariably involve an issue of fact); *First Union Nat'l Bank*, 838 A.2d at 428

(stating that factual determination may be required as to whether party used best efforts).

## 2. Analysis

Chrysler argues that the AESSA did not obligate it to pay any money to Meador and urges that its other efforts to resolve Meador's protest were "reasonable and prudent" in settling the protest within nine months. Chrysler points to evidence that its zone manager Joe Park (1) met with Meador's co-owner and sales manager (because Mr. Meador was ill and unavailable) soon after Meador filed its protest and urged withdrawal of the protest; (2) remained in constant contact with them; (3) later talked to Mr. Meador, who would not overrule his co-owner's answer of "no"; and (4) finally reminded Meador's representatives that Meador's protest was a breach of Meador's own contractual agreement not to protest other relocations or new dealerships in Project 2000. But Park never offered money to Meador to withdraw its protest because he did not think he needed to since Meador had signed a contract. Park also testified that he did not think Meador wanted money and instead wanted to delay Manuel's dealership as long as possible. Chrysler thus continued on its litigation path, seeking to have the administrative protest dismissed, obtaining a stay of those proceedings, and filing suit in federal court against Meador for an injunction and to compel arbitration regarding the validity of the protest.

In *CKB*, the Dallas court of appeals stated that "[w]hen a party misses the guidelines, courts measure the quality of its efforts by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator." 809 S.W.2d at 582 (citations omitted). While there is evidence of the circumstances surrounding Meador's protest, of Chrysler's efforts to have Meador withdraw that protest (which Chrysler refers to as evidence of efforts to settle), and of Chrysler's eventual settlement of the protest, the evidence is undisputed that Chrysler and Meador did not exchange settlement proposals until September 2000 and that they did not reach a settlement until October 4, 2000.

The trial court could have reasonably inferred that Chrysler wanted to "clear the market" for all of the dealerships participating in Project 2000 and that Chrysler's strategy was, in effect, to remove the protest waiver issue to federal court and seek arbitration to avoid a determination of that issue by the Commission under the Texas regulatory scheme (which is not to say that such a strategy was unreasonable per se). The federal district court denied injunctive relief and Chrysler's motion to compel arbitration on June 7, 2000, and issued an eleven-page order explaining the reasons, including that the validity of the protest waiver under the terms of the TMVC was more appropriately for the agency to decide and that Manuel was not a party and would not be bound by an arbitration award or a decision from the federal court. *See DaimlerChrysler Motors Corp. v. Meador Chrysler-Plymouth, Inc.*, No. A-00-CA-216-SS, at *10–11 (W. Dist. Tex.

23

June 7, 2000). Hence the federal court abated the suit in its own court and returned the issue to the administrative agency for decision. *Id.*[17] At least by that point, as the trial court in this case noted during closing arguments, Chrysler must have had "some understanding" of the unlikelihood of success with its litigation efforts. Yet Chrysler still did nothing to settle for several more months. During that time, Chrysler pursued its interlocutory appeal to the Fifth Circuit Court of Appeals and strategized with Manuel to coordinate his filing suit in state court against Meador, all of which only further delayed the resolution of the Meador protest. After settling with Meador in October 2000, Chrysler notified Manuel that he could proceed with building his facility in November 2000, and the protest was formally dismissed in December 2000. By that time, all of the other Project 2000 dealers in the area were selling cars. But Manuel was unable to begin building his new dealership facility by reason of the pending protest until after the settlement and, consequently, was not able to open for business until February 2002.

---

[17]The decision of the federal district court to return the proceedings regarding validity of the protest waiver to the Commission seems prescient, considering that it predated by less than a year the legislature's amendment of the TMVC to give the Commission original, exclusive jurisdiction over issues regarding sale and distribution and other issues governed by the Code and to require abatement of a suit seeking DTPA and other damages pending an administrative determination of Code-based issues that would govern the remainder of the case. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222 (Tex. 2002) (interpreting legislature's amendment to Section 3.01(a) of the Code, Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313, 327).

What would a prudent, comparable automobile manufacturer have done? As was acknowledged by the parties in the Settlement Agreement, Chrysler and Manuel both knew from the outset that a protest could entail significant delay, and Chrysler knew that a protest by any dealer participating in Project 2000 would present a significant obstacle to the accomplishment of its planned market realignment. The testimony was undisputed that Chrysler had planned all along to pay dealers for their agreement not to protest for that very reason and had budgeted $50 million toward preventing or resolving protests such as that filed by Meador in order to implement Project 2000 in the Dallas-Fort Worth area. Chrysler budgeted $11.2 million to pay another dealer for a protest waiver but ended up paying that dealer $1 million and giving him a new point (a new dealership), and Chrysler paid $1 million to another dealer who was not a Project 2000 participant in order to settle a threatened protest within a few days after that dealer approached Chrysler.

Although Chrysler offered evidence that Meador only wanted to delay Manuel's new dealership as long as possible, there was contradictory evidence that Meador might have been interested in a settlement and that it wanted a "point". Chrysler had two open points and a substantial remaining budget of around $30 million after payments to Manuel and other dealers but did not offer either money or a point to Meador until late September 2000, so there is no way to know what Meador would have accepted at an earlier date. And Chrysler's

25

witnesses were unable to explain why Chrysler never offered any of its multi-million dollar budget to settle the Meador protest.

Chrysler argues that the AESSA did not obligate it to pay any money to Meador, that it had no contractual obligation to use the $50 million it had allocated to its budget to settle protests by dealers, and that it could simply have "ignored" settling with Meador until it had fully litigated its pending federal court and administrative proceedings. Chrysler reasons that Manuel's position (and the trial court's finding of failure to use best efforts) imposed "an additional burden" on Chrysler of settlement. Chrysler argues that its choice to litigate rather than settle was solely within its discretion under the AESSA, that it was entitled to exercise its legal right to enforce Meador's agreement to waive the statutory right to protest, and that there was no prohibition in either the AESSA or the Settlement Agreement against Chrysler trying to hold Meador to its agreement. According to Chrysler, punishing it for choosing to pursue litigation rather than to settle would strip Chrysler of its right to access to the courts to enforce its rights.

By all of these arguments, Chrysler overlooks its agreement in the AESSA that contractually obligated it to use its best efforts not simply to litigate but "to litigate *or settle* the protest or lawsuit *in order to allow the establishment of the South Arlington dealership*." [Emphasis added]. The question is not *whether* Chrysler should have litigated, as we agree that was its right. Rather, the question is *when* did Chrysler's choice to litigate to the exclusion of making any

efforts toward settlement become unreasonable. *See CKB*, 809 S.W.2d at 582 (stating that when a party fails to meet goal or guideline, court measures quality of its efforts by circumstances and comparison of performance of the prudent comparable operator); *see also Herrmann Holdings*, 302 F.3d at 559 (stating court may look to circumstances of case and compare party's performance in similar cases in determining whether party failed to exercise best efforts).

According to a letter from Manuel's counsel, Chrysler assured Manuel in mid-June 2000 that it was going to dismiss the federal appeal and attempt to settle with Meador while Manuel filed suit and litigated against Meador in state court. Although Manuel did file and litigate that suit, Chrysler still made no effort to settle with Meador until late September. As held by the court in *CKB,* "[N]o efforts cannot be best efforts." *See* 809 S.W.2d at 582.

Applying the appropriate standard of review, we hold that there is legally sufficient evidence to support the trial court's finding that Chrysler breached the best efforts provision in the AESSA. *See Cent. Ready Mix Concrete*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *see also Martinez*, 977 S.W.2d at 334. We overrule the remainder of Chrysler's first issue.

## IV. LIMITATION OF DAMAGES

By its second issue, Chrysler contends that the trial court erred by awarding Manual damages of $370,668.50 based upon Manuel's claim for lost profits for the one-year period during which Manuel was not able to open the South Arlington dealership. Chrysler relies upon the AESSA's limitation-of-

damages provision, which limits recoverable damages solely to "out-of-pocket expenses that cannot be mitigated," and argues that Manual is barred from recovering lost profits as damages by waiver of "incidental and consequential damages" in both the AESSA and the Settlement Agreement.[18] Chrysler complains that the trial court erred as a matter of law in disregarding these contractual limitations of damages. Alternatively, Chrysler contends that, if the trial court concluded that the limitation of damages provisions were ambiguous, there is no evidence to support the trial court's finding of fact that the parties' intent was to allow recovery of "actual damages" under the Settlement Agreement.

## A. Preservation of Error

Manuel first asks us to summarily overrule Chrysler's second issue because Chrysler failed to negate every basis supporting the judgment. Specifically, Manuel argues that Chrysler only challenges "lost profits" but that the trial court could have rested its damage award on Manuel's individual claims for lost salary and rental income for which there is evidence and which Manuel asserts are independent grounds not challenged on appeal.

Rule of appellate procedure 38.1(f) provides that "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly

---

[18]As mentioned above, the trial court's findings of fact and conclusions of law do not expressly state that Chrysler breached the AESSA (as opposed to the Settlement Agreement), but only the AESSA contains a best efforts clause.

included." Tex. R. App. P. 38.1(f). In this regard, the Supreme Court of Texas has stated that "disposing of appeals for harmless procedural defects is disfavored"; that appellate courts are to construe appellate briefs "reasonably, yet liberally, so that the right to appellate review is not lost by waiver"; and that "appellate courts should reach the merits of an appeal whenever reasonably possible." *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008).

While Chrysler's second issue discusses the damages awarded in short-hand form as "lost profits," Chrysler's overarching contention is that the limitation-of-damages clause of the AESSA limits Manuel's damages to out-of-pocket expenses that cannot be mitigated.[19] None of Manuel's damage claims— whether for lost profits, lost owner's salary, or lost rental income—are for out-of-pocket expenses; each claim seeks recovery of benefit-of-the-bargain damages as if the contract had been performed. *See Bechtel Corp. v. Citgo Prods. Pipeline Co.*, 271 S.W.3d 898, 927 (Tex. App.—Austin 2008, no pet.) (stating that expectation damages are designed to award the claimant "the benefit of his bargain by being put in as good a position as he would have been had the contract or promise been performed").

---

[19]Out-of-pocket expenses are reliance damages designed "to reimburse the plaintiff for expenditures made toward execution of the contract, in order to restore the status quo before the contract." *See Foley v. Parlier*, 68 S.W.3d 870, 884–85 (Tex. App.—Fort Worth 2002, no pet.) (contrasting reliance or out-of-pocket damages with expectancy or benefit-of-the-bargain damages).

29

Whether Manuel may recover *any* damages (which would include lost profits, lost salary, and lost rentals) other than out-of-pocket expenses is fairly included within Chrysler's second issue; lost owner's salary and rental income are not independent, unchallenged grounds supporting the trial court's judgment. *See* Tex. R. App. P. 38.1(f); *Perry*, 272 S.W.3d at 586–87; *cf. Reliford v. BNSF Ry. Co.*, No. 02-09-00322-CV, 2011 WL 255795, at *1 (Tex. App.—Fort Worth Jan. 27, 2011, no pet.) (mem. op.) (holding appellant failed to challenge each independent ground supporting judgment because jury found statute of limitations barred claim and appellant only complained of charge error on his affirmative cause of action). Thus, we will address the merits of Chrysler's second issue.

## B. Applicable Law

Included within the resolution of Chrysler's second issue are legal determinations relating to the interpretation of contracts, the consideration of separate writings together, ambiguity, and the differences between direct and consequential damages for breach of contract.

### 1. Rules of Interpretation and Contract Construction

Interpretation of an unambiguous contract is a question of law for the court to decide de novo. *Coker*, 650 S.W.2d at 393. Our primary concern in construing a written contract is to ascertain the objective intent of the parties as expressed in the contract. *Id.*; *City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App.—Fort Worth 2008, pet. dismissed). We

30

examine and consider the entire document in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex. 2006); *Coker*, 650 S.W.2d at 393; *City of the Colony*, 272 S.W.3d at 722.

We examine all parts of the agreement in light of the circumstances surrounding the formation of the contract. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996). Instruments pertaining to the same subject matter must be considered together to ascertain the intent of the parties. *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding); *see City of Keller*, 168 S.W.3d at 811 (even writings executed at different times must be considered together if they pertain to the same transaction); *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex. 1999). We view the contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)); *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 772 (Tex. App.—Fort Worth 2010, no pet.).

Whether a contract is ambiguous is a question of law for the court. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Lack of clarity does not create an ambiguity, and a contract is not ambiguous merely because the parties advance conflicting interpretations. *Id.; City of the Colony*, 272 S.W.3d at 722. We determine whether a contract is ambiguous by considering

31

the contract as a whole in light of the circumstances present when the parties entered into it. *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). The trial court should ascertain the objective intent of the parties as expressed in the writing itself. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex. 1981). A contract is ambiguous when its meaning remains uncertain or subject to more than one reasonable interpretation after it is subjected to applicable rules of interpretation. *Frost Nat'l Bank*, 165 S.W.3d at 312; *Coker,* 650 S.W.2d at 393–94. It is only after a determination by the trial court that the contract is in fact ambiguous that parol evidence becomes admissible, and then only to assist the fact finder in determining what the subjective intent of the parties was at the time they entered into the contract. *See Sun Oil Co.*, 626 S.W.2d at 731; *see also Coker*, 650 S.W.2d at 395.

### 2. Law on Contract Damages

Because the agreements do not define the terms "actual damages" or "consequential damages," we presume that the parties intended their ordinary meanings. *Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade,* 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The trial court found, and neither party disagrees, that the AESSA did not involve the sale of goods or services. Therefore, we will apply common-law definitions rather than those set forth in Article 2 of the UCC. *See id.* (holding supply contract for purchase of natural gas to operate cogeneration facility not a contract for sale of goods and thus applying common law rather than UCC definition of

32

consequential damages); *Wade & Sons, Inc. v. Am. Standard, Inc.*, 127 S.W.3d 814, 823 (Tex. App.—San Antonio 2003, pet. denied) (noting different definitions used for direct and consequential damages under Texas common law and as Texas courts have interpreted the UCC).

At common law, the term "actual damages" encompasses both "direct" and "consequential" damages. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997); *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992) (Phillips, C.J., concurring). "Direct damages," also known as "general damages," are those inherent in the nature of the breach of the obligation between the parties, and they compensate a plaintiff for a loss that is conclusively presumed to have been foreseen by the defendant as a usual and necessary consequence of the defendant's act. *Arthur Anderson & Co.,* 945 S.W.2d at 816*; Cherokee Cnty.*, 305 S.W.3d at 314. One measure of direct damages is the "benefit of the bargain" measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received. *See Mood v. Kronos Prods., Inc.,* 245 S.W.3d 8, 12 (Tex. App.—Dallas 2007, pet. denied) (generally, measure of damages for breach is that which restores injured party to position he would have had if contract had been performed); *Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 111 n.5 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (citing *Henry S. Miller*, 836 S.W.2d at 163).

"Consequential damages," also referred to as "special damages," are those said to result naturally but not necessarily from the wrongful act because

33

they require the existence of some other fact beyond the relationship of the parties. *Arthur Andersen*, 945 S.W.2d at 816 (consequential damages not necessarily referable to the breach, but the loss must still have been reasonably foreseeable or within the contemplation of the parties); *Henry S. Miller,* 836 S.W.2d at 163; *Cherokee Cnty.*, 305 S.W.3d at 313–14*; Tenn. Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *8–9 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (mem. op.) (op. on reh'g).

Damages that might be considered "consequential" in one contract may be direct damages in another. As Judge Cardozo wrote many years ago, the distinction between direct and consequential damages under the common law is not absolute: "There is need to keep in mind that the distinction is not absolute, but relative. To put it in other words, damage which is general in relation to a contract of one kind may be classified as special in relation to another." *Kerr S.S. Co. v. Radio Corp. of Am.*, 157 N.E. 140, 141 (N.Y. 1927) (also noting that damages for delay may be direct in some instances and consequential in others); *see Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.*, 286 F.3d 1001, 1004 (7th Cir. 2002) (Posner, J.) (stating that common law "distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach"); *Computrol, Inc. v. Newtrend*, *L.P.*, 203 F.3d 1064, 1071 n.5 (8th Cir. 2000) ("We are not convinced that the [contract's] restriction on 'special, incidental, or consequential damages,' standing alone, precludes the recovery of

lost profits . . . . [I]t is incorrect to classify mechanically . . . lost profits . . . as consequential damages."). If the language of the contract indicates that the parties contemplated lost profits as the probable result of the breach, then those lost profits are more properly seen as a part of the contract, itself, and thus a form of direct damages. *Viastar Energy, LLC v. Motorola, Inc.*, No. 1:05-CV-1095-DFH-WTL, 2006 WL 3075864, at *5–6 (S.D. Ind. Oct. 26, 2006); *see also* White & Summers, Uniform Commercial Code § 10-4 (Update 2011) (noting that it is a "fallacy" to assume that damages to a buyer, such as those resulting from delay, are inherently consequential, since damages that are consequential under one contract may be direct or ordinary under another); 11 Corbin on Contracts § 56.6 (2005) (noting courts' difficulty in establishing a workable distinction between general and special damages, and observing that the appropriate distinction of claimed damages varies with the context). Even under the UCC, it has been noted that consequential damages under § 2.715(2) may overlap with difference in value damages recoverable under § 2.714(2). White & Summers, Uniform Commercial Code § 10-4.[20]

---

[20]Despite the vast number of cases purporting to define "consequential damages" by repeating the same time-honored but general definitions and distinctions between consequential and direct damages, the meaning remains elusive. *See, e.g.*, *T.Co Metals, L.L.C. v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 341 (2nd Cir. 2010) (citing White & Summers, Uniform Commercial Code § 10-2 (5th ed. 2006) (noting "reasonable persons often differ whether an item of damage is 'consequential'"); *Applied Data Processing, Inc. v. Burroughs Corp.*, 394 F. Supp. 504, 508 (D. Conn. 1975) (discussing Michigan law and stating neither in Michigan nor elsewhere does the term "consequential damages" have a clearly established meaning); *see also* Glenn D. West, Sara G. Duran,

Lost profits may be either "direct" or "consequential" damages, depending on their nature. *Cherokee Cnty.*, 305 S.W.3d at 314; *Mood*, 245 S.W.3d at 12; *Cont'l Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 475 (Tex. App.—Eastland 2003, no pet.). As Chrysler argues, profits lost on other contracts or relationships resulting from the breach (such as resale of property to a third party) are generally classified as indirect or consequential damages. *See Mood*, 245 S.W.3d at 12; *Leahy*, 132 S.W.3d at 475. However, lost profits that represent the benefit-of-the-bargain measure of damages required to restore the plaintiff to the economic position he would have enjoyed if the contract had been performed are "direct" damages when shown to be "conclusively presumed" to have been foreseen by the parties as a usual and necessary consequence of a breach. *See Cherokee Cnty.*, 305 S.W.3d at 314.

## C. Analysis

### 1. Relevant Contractual Language

In relevant part, the limitation-of-damages provision in the AESSA states:

In the event of default under this Agreement, *the sole liability of the defaulting party is payment of the other party's out-of-pocket expenses that cannot be mitigated. Both [Manuel] and [Chrysler]*

---

*Reassessing the "Consequences" of Consequential Damage Waivers in Acquisition Agreements*, 63 Bus. Law 777, 780 (May 2008) (suggesting that few transactional lawyers can define "'consequential' damages accurately and many misconstrue the impact a waiver of such damages may have"); Gregory K. Morgan & Albert E. Phillips, *Design Professional Contract Risk Allocation: The Impact of Waivers of Consequential Damages and Other Limitations of Liabilities*, 33 J.C. & U.L. 1, 13 (2006) (stating "no one knows what consequential damages are or may be, at least not with predictability or uniformity").

*waive all rights to other compensatory damages or to consequential or punitive damages* under any theory of law or cause of action. [Emphasis added.]

The Settlement Agreement, to which the AESSA is attached as "Exhibit A," also contains a limitation-of-damages provision, which states as follows:

[Manuel] and [Chrysler] *waive any claims they may have for incidental or consequential damages*, for punitive or exemplary damages, and for jury trial, that may arise by virtue of any breach of this [Settlement] Agreement *or the AESSA*, or by virtue of any transaction based in whole or in part upon a provision of this [Settlement] Agreement *or the AESSA*. *The parties remain liable for any actual damages*. [Emphasis added.]

The Settlement Agreement also provides that

[t]his [Settlement] Agreement is not part of the Sales and Service Agreement of any dealership. The terms of any Sales and Service Agreement prevail if there is any conflict. *To the extent that there is any conflict between this [Settlement] Agreement and any other agreement or document other than a Sales and Service Agreement between [Chrysler] and [Manuel], the terms of this [Settlement] Agreement prevail*. [Emphasis added.]

## 2. Agreements Must Be Construed Together

Chrysler first contends that only the limitation-of-damages provision in the AESSA (limiting Manuel's recovery solely to "out of pocket expenses that cannot be mitigated") applies because the trial court found that Chrysler failed to use its best efforts and only the AESSA contains a "best efforts" clause.[21] But Manuel

---

[21]Chrysler intimates that the AESSA is only a letter of intent for which Manuel paid Chrysler nothing. But Manuel gave up his longstanding, successful Chrysler line at his Richardson dealership (Manuel's lost profits that he would have received from the Richardson dealership as the result of the delay while he waited to build and open his new dealership constituted his alternative measure of damages) and agreed to waive his own rights to protest any other relocations

37

replies that the Settlement Agreement must be considered together with and applies to any breach of the AESSA and further states that the Settlement Agreement prevails over the AESSA in the event of a conflict, meaning the trial court correctly awarded damages pursuant to the Settlement Agreement's limitation-of-damages provision, which provides that "[t]he parties remain liable for any actual damages."

Chrysler does not challenge the trial court's finding that the Settlement Agreement and the AESSA "comprise the entire agreement between the parties." That finding mirrors ¶3(l) of the AESSA, which states that "[t]his Agreement, together with the [Settlement Agreement] executed contemporaneously with this agreement, is the entire Agreement between [Manuel] and [Chrysler]." The Settlement Agreement refers to and describes the purpose of the AESSA to "allow Manuel to apply to the State of Texas for permission to establish a Chrysler, Plymouth, and Jeep Dealership in Tarrant County, within the Dallas Market at the location set forth in Exhibit A [the AESSA]."

---

or new dealerships in Project 2000. Moreover, Chrysler has not argued that the AESSA was not binding, nor has it challenged the trial court's conclusion that the AESSA (as well as the Settlement Agreement) is valid and enforceable. Letters of intent may be enforceable as valid contracts where parties agree on material terms even where they leave open other terms for later negotiation. *Foreca, S.A. v. GRD Dev. Co.,* 758 S.W.2d 744, 746 (Tex. 1988) (holding intent to be bound is essential element of enforceable agreement); *John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 19 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (noting intent to be bound by letter of intent may be found as a matter of law).

The Settlement Agreement contains numerous other references to the AESSA. And significantly, the limitation-of-damages provision in the Settlement Agreement also states that it applies to "any claims for damages by virtue of any breach of this [Settlement] Agreement *or the AESSA*." [Emphasis added]. Finally, the Settlement Agreement provides that, to the extent of any conflict with any other agreement (other than a Sales and Service Agreement, not at issue here), which would include the AESSA, "*the terms of this [Settlement] Agreement prevail*." [Emphasis added.]

We agree with Manuel that the two agreements must be construed as one instrument and interpreted together. Although the AESSA limits Chrysler's liability for breach of that agreement to "out-of-pocket expenses that cannot be mitigated," the Settlement Agreement states that it applies to any breach of that agreement *or the AESSA*, that it prevails to the extent of any conflict with the AESSA, and that "[t]he parties remain liable for *any* actual damages." [Emphasis added.]

### 3. Lost Profits May Be Direct or Consequential Damages

There is no bright-line rule that lost profits always constitute consequential damages under the common law (as Chrysler seems to contend), and Chrysler's cases holding that lost profits are consequential damages are not persuasive. For example, *Tooke v. City of Mexia,* 197 S.W.3d 325, 329 (Tex. 2006), did not involve common law consequential damages but instead interpreted section 271.153 of the Texas Local Government Code, which limits recovery to the

39

"balance due and owing" under a contract with a city plus interest, thereby excluding recovery *under that statute* for all lost profits as consequential damages.[22]

In *Leahy,* 132 S.W.3d at 475, also relied upon by Chrysler, the limitation-of-damages provision expressly excluded recovery for "lost profits," both direct or consequential. Neither the AESSA nor the Settlement Agreement in this case even mentions "lost profits," nor do the limitation-of-damages provisions purport to allocate that risk to either party, even though the lost profits were the only type of damages that Manuel would likely suffer from a significant delay caused by a protest from another dealer and that very risk was expressly mentioned in the Settlement Agreement and addressed by both the Settlement Agreement and the AESSA. Courts have construed limitation-of-damages clauses to preclude both direct and consequential lost profits where the clauses expressly waived damages for either lost profits or consequential damages, but have held that direct lost profits were not precluded where only "consequential" damages, either generally or "including" lost profits, were waived. *Compare id.* (limitation-of-liability clause precluded both direct and consequential lost profits where contract waived damages for "*loss of profits, loss of business*, or any other indirect or

---

[22]We agree with our sister court in *Cherokee County* that *Tooke* should not be extended beyond the governmental-immunity context. *See* 305 S.W.3d at 315 n.8 (noting that lost profits are consequential damages under local government code section 271.153) (quoting *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 359 (Tex. App.—Houston [14th Dist.] 2008, no pet.)).

consequential damages" (emphasis added)), *with Cherokee Cnty.*, 305 S.W.3d at 314 (holding direct lost profits recoverable although contract disallowed "consequential" damages), and *Tenn. Gas*, 2008 WL 3876141, at *6–8 (holding clause limiting recovery of consequential damages "including . . . lost profits" barred only consequential lost profits).[23]

The recent *Cherokee County* case supports recovery of lost profits for resale to third parties as direct damages in the face of a limitation-of-damages clause, similar to the one in this case, which waived recovery of consequential damages without mentioning lost profits. *See* 305 S.W.3d at 315. In that case, a long-term contract for purchase of gas to operate a cogeneration facility contained a provision allowing the buyer to use the gas to operate the facility or to resell the gas to third parties. *Id.* at 311. When the seller failed to deliver the required volumes of gas as the claimed result of weather disruptions, the buyer sued for damages based on the difference between the amount it would have to pay under the contract and the much higher amount that it would have received by selling the gas to third parties during that period. *Id.* at 311–12. The seller contended that the damages amounted to lost profits waived by the clause prohibiting recovery of consequential damages, and the trial court granted summary judgment to the seller. *Id.* at 312. The Houston Fourteenth Court of

---

[23] *See also Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (holding direct lost profits allowed where clause provided "no consequential damages are recoverable includ[ing], but . . . not limited to, lost profits, lost revenues and lost business opportunities").

41

Appeals reversed and remanded, holding that the lost profits from the buyer's inability to resell gas not delivered to customers at the higher market value were "direct" damages not precluded by the waiver of "consequential" damages contained in the contract. *Id.* at 314–15. Holding that the contract was not a sale of goods controlled by the UCC, the court used the common law definition of "consequential damages" and held that, by the parties' express agreement that the buyer could resell the gas to a third party, the contract thereby implicitly authorized the buyer to profit from increases in the market price of the gas; thus, any wrongful interference with that contract right "would naturally and necessarily cause [the buyer] to suffer direct damages in the form of profits on the [a]greement itself."[24] *Id*. at 315 & n.11. Thus, depending on the unique circumstances of each case, including the specific language of the contract, lost profits may be direct or consequential damages.

### 4. Ambiguity Concerning Recoverable Damages

#### a. Conflict Concerning Recoverable Damages

Considering the contracts together, the AESSA limits Chrysler's liability to out-of-pocket expenses, but the Settlement Agreement provides that it "prevails" to the extent of any conflict with the AESSA and states that the parties "remain

---

[24]The Houston court contrasted those direct loss of profits from inability to sell the gas with profits lost on its contracts for sale of *electricity* produced from the gas at its cogeneration facility, which would be consequential damages. *Id*. at n.12; *see also Tenn. Gas*, 2008 WL 3876141, at *8 (holding gas pipeline suffered consequential damages when seller's failure to timely deliver purchased *equipment* prevented it from selling gas to its customers).

liable for any actual damages." The first and most obvious conflict is between the AESSA, which limits recovery to out-of-pocket expenses and excludes consequential damages, and the Settlement Agreement, which allows recovery for actual damages. The second conflict is between the retention of liability for "any actual damages" and the waiver of consequential damages, both within the same paragraph of the Settlement Agreement.

Chrysler attempts to reconcile the obvious conflict between the limitation to "out-of-pocket expenses" in the AESSA and the retention of liability for "actual damages" in the Settlement Agreement by focusing on a waiver of "consequential" damages contained in both agreements. Chrysler argues that the lost profits damages awarded to Manuel are barred from recovery under both agreements as "consequential damages" because they constituted only anticipated lost income from collateral contracts, that is, retail sales that Manuel claimed his new dealership could have made to third parties during its first year of operation had it opened on time. But as discussed above, lost profits are not per se consequential damages solely because sales to third parties are involved. *See, e.g., Cherokee Cnty.*, 305 S.W.3d at 314–15.

Chrysler also posits that one measure of direct "actual damages" is "out-of-pocket expenses" and that interpreting the retention of liability for "actual damages" so as to allow Manuel's recovery only of out-of-pocket expenses (by reason of the waiver of consequential damages) is consistent with the limitation of damages in the AESSA to out-of-pocket expenses. While this proposed

43

construction superficially harmonizes the two clauses, the limitation-of-damages clause in the AESSA already uses the term "out-of-pocket expenses."  It is not reasonable to interpret both terms, that is, "actual damages" and "out-of-pocket expenses," to have the same meaning as that would render one or the other term meaningless or redundant.  *See Cmty. Improvement Ass'n of Lake Conroe Hills, Inc. v. Beckham*, No. 07-03-00036-CV, 2004 WL 2000666, at *4 (Tex. App.—Amarillo 2004, no pet.) (mem. op.) (declining to interpret different words used in document to have the same meaning, effectively rendering one or the other redundant); *Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 354 (Tex. App.—Texarkana 2000, no pet.) (holding that construing different terms to have same meaning would render some words to be meaningless); *see also Penncro Assocs., Inc.*, 499 F.3d at 1157 ("When a contract uses different language in proximate and similar provisions, we commonly . . . assume that the parties' use of different language was intended to convey different meanings.").  Thus, we must assume that the use of the term "actual damages" rather than "out-of-pocket expenses" in the Settlement Agreement was for a purpose and means something other than "out-of-pocket expenses."

Chrysler next argues that reading the limitation of damages clause in the Settlement Agreement so that the more specific waiver of consequential damages controls over the more general term "actual damages" leads to a conclusion that the parties intended to retain liability only for actual damages that are not incidental or consequential, meaning direct damages may be recovered

44

but that Manuel's lost profits are unrecoverable consequential damages. Chrysler cites *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) for the secondary rule of construction that specific provisions control over general provisions.[25] But *Forbau* further states that "[t]his is but an application of our long-established rule that '[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'" *Id.* (quoting *Guardian Trust Co. v. Bauereisen*, 132 Tex. 396, 403–05, 121 S.W.2d 579, 583 (1938)). And it bears repeating that lost profits are not per se consequential damages solely because there will be a subsequent sale to third parties. *See, e.g., Cherokee Cnty.*, 305 S.W.3d at 314–15.

---

[25]Chrysler also argues that the waiver of "other compensatory damages" (in addition to the waiver of consequential damages) in the AESSA is more specific and controls over the more general retention of liability for "actual damages" in the Settlement Agreement (applying the specific-over-general rule of construction, so as to preclude recovery of all lost profits). But the ordinary meanings of the terms "actual damages" and "compensatory damages" are that they are synonymous. *See Tate v. Hernandez*, 280 S.W.3d 534, 541 (Tex. App.—Amarillo 2009, no pet.) (holding "actual damages" and "compensatory damages" have same meaning); *Anderson v. Alcus*, 42 S.W.2d 294, 296 (Tex. Civ. App.—Beaumont 1931, no writ) (noting "actual damages" are synonymous with "compensatory damages"). Chrysler's only suggestion to resolve this conflict is to ignore the provision in the Settlement Agreement allowing recovery of actual damages. Application of that rule of construction here would require that we simply disregard that provision in violation of the basic rule that we avoid interpreting contracts so as to render terms meaningless. Second, we are at a loss to see how one synonymous term can be more specific than another. Third, Chrysler overlooks the provision that the Settlement Agreement "prevails" in the event of a conflict with the AESSA, so that the parties' retention of liability for "actual damages" in the Settlement Agreement trumps the waiver of "other compensable damages" in the AESSA.

Chrysler's proposed interpretation—that the more specific waiver of consequential damages controls over the more general term "actual damages," meaning Manuel may only recover lost profits that are "direct damages"—is reasonable. But this does not end our analysis because Chrysler's interpretation is not the only reasonable interpretation of the agreements. Manuel contends that the two agreements are ambiguous because they conflict on their face when read together.[26] Specifically, Manuel points out that the Settlement Agreement expressly provides that it "prevails" in the event of a conflict with the AESSA and that the Settlement Agreement's limitation of damages provision expressly states that it applies to a breach of the AESSA. Manuel also points to the inherent conflict between the Settlement Agreement's purported waiver of consequential damages and simultaneous retention of liability for *any* actual damages. Given these conflicts and the provisions in the AESSA that time was of the essence and that Chrysler had the obligation to use its best efforts to litigate or settle any protest so that the South Arlington dealership could open by January 1, 2001,

---

[26]Manuel, citing *Wilburn v. Mo.-Kan.-Tex. Ry. Co. of Tex.*, 268 S.W.2d 726, 731 (Tex. Civ. App.—Dallas 1954, no writ) (op. on reh'g) (stating that "[a] contract will not be construed to limit the remedial rights of the parties unless such an intention is clear"), argues that the limitation-of-damages clauses are ambiguous, which renders them unenforceable. While we agree that the clauses are ambiguous as discussed below, this rule of construction is inapplicable here because the contracts provide that their terms will not be strictly construed against either party. Moreover, this rule of strict construction does not apply in the context of commercial contracts between sophisticated parties. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 387 (Tex. 1997) (holding no-damages-for-delay clause enforceable in agreement between experienced parties familiar with such risk-shifting clauses).

Manuel's interpretation of the agreements—preserving the right to recover *any* actual damages—is also reasonable.

After applying the applicable rules of interpretation and considering all of the circumstances surrounding the execution of the agreements; the lack of specific waiver of lost profits in either agreement; and the lack of any definition of consequential, compensatory, or actual damages, we are left with terms that remain subject to more than one reasonable interpretation. They are therefore ambiguous as a matter of law, and we hold that the trial court did not err by implicitly finding that the contracts are ambiguous.

### b.  Evidence of Parties' Intent

While the trial court did not make an explicit conclusion of law that the contract was ambiguous, it implicitly did so because it made a finding of fact that the parties "intended to retain the right to actual damages." Chrysler argues in the last part of its second issue that there is no evidence to support the trial court's finding of the parties' intent because no witness provided parol evidence of the parties' intent concerning the damage waiver provisions since neither Manuel's attorney nor Chrysler's attorney—the only persons who drafted or negotiated wording changes in the agreements—were asked any questions on this topic and because no changes were made in the damage limitations in the agreements.

Chrysler provides no case law stating that parol evidence of the parties' true intent as an issue of fact is required when a contract is ambiguous. Rather,

the rule is that parol evidence of intent of the parties *may* be considered when the court has determined that a contract is ambiguous. *Philadelphia Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 587 (Tex. App.—Fort Worth 2004, no pet.) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995), and *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993)). The primary and best evidence of the parties' intent remains the agreement itself, considered in light of all of the surrounding facts and circumstances. *See Emerald Tex., Inc. v. Peel*, 920 S.W.2d 398, 402 (Tex. App.—Houston [1st Dist.] 1996, no writ) (citing *City of Pinehurst v. Spooner*, 432 S.W.2d 515, 518 (Tex. 1968)). The fact finder may consider other evidence that may be helpful in illuminating the parties' true intent. *Sw. Airlines Co. v. Jaeger*, 867 S.W.2d 824, 829–30 (Tex. App.—El Paso 1993, writ denied), *disapproved of on other grounds by Dallas Market Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 386–87 (Tex. 1997), *overruled, Torrington Co. v. Stutzman*, 46 S.W.3d 829, 840 n.9 (Tex. 2000). Moreover, parties do not ordinarily contract with reference to what happens if there is a breach. "Parties generally have their minds addressed to performance of contracts—not to their breach or the consequences which will follow a breach." *See* 24 R. Lord, Williston on Contracts § 64:15 (4th ed. 1999).

In this case, there is legally sufficient evidence to support the trial court's finding that the parties intended to retain the right to actual damages, even though there is not specific testimony of their subjective intent regarding the limitation of damages provisions. That evidence included the agreements

48

themselves; the circumstances surrounding Chrysler's planning, negotiations, and implementation of Project 2000; the sophistication and longstanding relationship of the parties; the parties' negotiations; Chrysler's need for franchised dealers to be able to sell Chrysler's motor vehicles to the public; the purpose of the agreement for a franchise, which was for both Chrysler and Manuel to make profits from car sales; the overriding importance to success of the marketing plan such that each participating dealer agreed to waive the right to protest another dealer; and, finally, the recognition by both parties that a protest might nevertheless be made and result in significant delay in opening the new dealership.[27]

Chrysler agreed in the AESSA to grant a franchise to Manuel, and the AESSA specifically set forth Chrysler's "planning potential" for Manuel's new dealership as 1,076 vehicles to be supplied by Chrysler in the new dealership's first year so that Manuel could resell those vehicles to consumers. As conditions required for Chrysler to grant Manuel the franchise, Manuel was to acquire suitable land for the construction of the dealership and provide building and site plans to be approved by Chrysler for a facility—the minimum requirements for

---

[27]Moreover, a limitation or waiver of damages in a contract is an affirmative defense, so that Chrysler, rather than Manuel, had the burden of proof to offer any parol or other extrinsic evidence that the parties' true intent was to preclude recovery of the damages claimed by Manuel. *See Leahy*, 132 S.W.3d at 475; *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 928 S.W.2d 56, 63 (Tex. App.—Fort Worth 1995), *rev'd in part on other grounds,* 936 S.W.2d 275 (Tex. 1996) (per curiam).

which were specifically set forth (excluding a body shop) in the AESSA as 20,350 square feet of facility including a new vehicle showroom for six vehicles, a parts department of 5,500 square feet, a service department of 11,500 square feet with 22 service stalls, and 110,100 square feet of total land area. The AESSA stated these requirements were based upon Chrysler's "planning potential" of "1076 units" for the first year of operation of the dealership. Additionally, in November 2001, Chrysler prepared for Manuel a "Dealer Agreement Portfolio" including a document signed by Manuel and titled "DAP-3," which forecast the new dealership's net profit as $702,674 for its first year of actual operation based upon Chrysler's estimated "planning potential" for the new dealership's first year of actual operation along with parts and service, minus expenses.

Jim Dimond, Chrysler's national market representation manager in 2000 and whose department developed Project 2000, testified his department determined dealer planning potential. Chrysler purchased data on auto registrations from all parts of the country, demographic data with population and income levels, and counts of competitive dealers in market areas. Dimond explained that "planning potential" is each market's share of "forward looking financial volumes." As Dimond noted, the AESSA cautioned that planning potential was not intended to predict the number of units that the dealer would sell or that Chrysler would sell to the dealer and that number might change with market conditions. Nevertheless, he admitted that Chrysler used planning

50

potential for the number of anticipated sales for the first year for a new franchised-dealership because it is "the best number if we have no track record."

Dimond described the South Arlington area as a growing market with a strong population and increasing income where Chrysler needed to establish more "points." Dimond explained that the only way that a dealer can sell cars in the United States and the only way a manufacturer can distribute cars for sale to consumers is through a franchised dealership. As relevant here, the TMVC defines a "franchise" as one or more contracts between a franchised dealer as franchisee and a manufacturer (or distributor) as franchisor, in which: "(A) the franchisee is granted the right to sell and service new motor vehicles manufactured or distributed by the franchisor or to service motor vehicles under the contract and a manufacturer's warranty" and "(D) the franchisee's business substantially relies on the franchisor for a continued supply of motor vehicles, parts, and accessories." Tex. Occ. Code Ann. § 2301.002 (West 2008).

Van Gray, Chrysler's national dealer placement manager in 1998 and 1999, testified that Chrysler would not have undertaken the risky venture of slating a new dealership in the South Arlington area unless it thought the dealership could make money. It belabors the obvious to say that Chrysler and Manuel were sophisticated parties in the automobile business and, as reflected by the agreements, that both knew a protest from another dealer was possible and could result in significant delay. But the AESSA placed the obligation to use best efforts to litigate or settle the protest on Chrysler (requiring only that Manuel

51

cooperate with Chrysler) and provided that time was of the essence, and Manuel's actual damages could be no other than the profits he lost by reason of the delay caused by Chrysler's failure to use its best efforts to litigate or settle the Meador protest.[28]

Considering the evidence favorable to the trial court's finding concerning the parties' intent if a reasonable factfinder could and disregarding evidence contrary to the finding unless a reasonable factfinder could not, we hold that legally sufficient evidence supports the trial court's finding that the parties intended to retain liability for the damages awarded to Manuel in this case. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 827. There was ample evidence from which the trial court could reasonably have found that the parties intended to allocate the risk of delay from any protest to Chrysler such that it was to retain liability for "any actual damages" including Manuel's lost profits, rentals, or salary resulting from such a delay. We therefore overrule Chrysler's second issue.

## V. RELIABILITY OF EXPERTS

By its third issue, Chrysler contends that the trial court abused its discretion in admitting the testimony of Allen Wilkerson, Manuel's CPA, and

---

[28]The amount of damages awarded by the trial court was within the range of and less than half of Chrysler's own estimate and, as indicated by the trial court in a letter to the parties, amounts to approximately four months' of lost profits. The amount could have tied to the four-month period, from June 7, 2000, when the federal district court denied relief to Chrysler, to October 4, 2000, the date of Chrysler's ultimate settlement with Meador.

Dr. James R. Vinson, Manuel's economist, regarding "lost profits" of the new dealership in this case because both experts' opinions were based upon an unreliable methodology and foundation. Chrysler characterizes the testimony and opinions as falling into the "scientific testimony arena" subject to its *Daubert/Robinson* challenge and running objection to the testimony at trial. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93, 113 S. Ct. 2786, 2796 (1993); *E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

For Manuel's primary damage model, his experts determined lost profits from the South Arlington dealership's delay in opening from November 2001 to November 2002 based upon actual data from Manuel Dodge (the Richardson dealership) for that period. Vinson referred to the damages model as the "business plan model," which he said is accepted in the industry for financing and venture capital for projected profitability and which has been relied upon in other Texas cases.

Vinson testified that he asked Wilkerson to use Chrysler's online manual for the specific criteria per unit and the Richardson dealership's actual records during the same period regarding actual profits and expenses as a "yardstick," which he testified was the most comparable business to the South Arlington dealership because it was, like the South Arlington dealership, also a two-line dealership (after Manuel ceased selling the Chrysler line) that was actually in

53

operation during that period, located in a similar area with similar demographics, and was under the same ownership and management.

Vinson chose the figure of 1,076 new units because Chrysler calculated that number as the "planning potential" for anticipated sales from that dealership for 2001 as a performance guideline based on Manuel's historical experience of operating at or near Chrysler's planning potential. Wilkerson performed the calculations comparing the proposed South Arlington dealership and the Richardson dealership, and he testified that the "adjusted forecasted income loss" to the South Arlington dealership, because it was not open during 2001, was $864,468. Wilkerson also testified that Manuel would have, in addition, personally earned an owner's salary of $475,632 and collected rent paid to him by the dealership entity in the amount of $600,000. Thus, Manuel's total net profit according to Vinson and Wilkerson would have been $1,940,100 for the period that he could not open the South Arlington dealership.

Chrysler challenged the admissibility of the testimony of both experts as being based upon an unreliable foundation and methodology, contending that: (1) their damage model was not an acceptable methodology for calculating lost profits; (2) neither witness considered actual sales of the new dealership after it finally opened in 2002; (3) nor did they consider other comparable dealerships in the area but instead used as their "benchmark" Manuel's own most successful dealership from a different market for a "shining star year" of sales; (4) they relied upon Chrysler's "planning potential" for 2001 to estimate future sales and did no

independent market or demographic analysis; (5) they failed to include start-up costs for the new business; and (6) they used estimates of Dodge sales to formulate opinions on Chrysler/Jeep sales.

## A. Reliability Test

We do not regard the *Robinson* test for reliability of scientific opinions to be applicable to the expert opinions in this case. Instead, we hold that the general reliability test of *Gammill* is more appropriate. *Compare Robinson,* 923 S.W.2d at 556 (relying on *Daubert* and identifying six nonexclusive factors for determining whether scientific evidence is reliable), with *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998) (holding factors listed in *Daubert* and *Robinson* cannot be applied to all expert testimony, but general requirements of Texas Rule of Evidence 702 for reliability still require trial court to determine whether testimony is supported by more than credentials and *ipse dixit* of expert and to ensure that opinion comports with applicable professional standards and has a reliable basis in the knowledge and experience of the discipline); *see also Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 448 (Tex. App.—Eastland 2006, pet. denied) (holding *Gammill* test appropriate for expert testimony of a certified public accountant regarding analysis of financial records for tracing of embezzled funds).

## B. Methodology

Chrysler argues that the method utilized by Vinson for determining lost profits was improper. Chrysler's own expert, however, did not testify that the

methodology used by Manuel's experts was improper, nor did he propose another method or calculate or offer an opinion as to what the actual sales for 2001 would have been for the twelve months that the South Arlington dealership was not open. *See KMG Kanal-Muller-Gruppe Deutschland GMBH & Co. v. Davis,* 175 S.W.3d 379, 396 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding testimony of expert with doctorate in economics, who taught a university course in corporate evaluation and whose method of business valuation was not shown to have been rejected by any authority or opposing expert, was reliable under *Gammill*).

There is no one proper method for determining lost profits as damages. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (noting that supreme court was "not retreating from our refusal to endorse one method for determining lost profits") (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 85 (Tex. 1992)). The "yardstick" method used by Vinson, consisting of a study of profits from business operations that are closely comparable to that of a plaintiff, has been accepted for calculating lost profits and, in particular, for new businesses. *See Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974) (recognizing "yardstick" and "before and after" as two generally recognized methods of determining lost profits as damages). Texas courts have accepted the yardstick analysis specifically for determining lost profits from a new business by using a comparable established business that is also owned and operated by the plaintiff, as in this case. *See,*

56

*e.g., Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc.*, 138 S.W.3d 915, 925 (Tex. App.—Dallas 2004, pet. struck) (holding expert opinion proper for lost profits based on projected revenues minus projected operating expenses for plaintiff's own existing business); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex. App.—San Antonio 1996, writ denied) (describing model presented by expert as having intelligent, objective basis by taking into account historical operations of other franchises operated by plaintiff, potential for failure of new franchise, and other factors including plaintiff's experience in the industry as well as historical data on his franchise operations); *Pena v. Ludwig*, 766 S.W.2d 298, 303 (Tex. App.—Waco 1989, no writ) (holding reasonableness or reliability of methodology went to weight and not admissibility where profits of established business of plaintiff could serve as a reliable basis for calculating lost profits of new business; plaintiff was primarily responsible for operating both shops and familiar with their management and financial condition, and factual data from established business provided sound basis for probable loss to new business). Thus, we reject Chrysler's assertion that the expert testimony was unreliable because it was based on the "yardstick" method.

## C. Foundational Data

We interpret Chrysler's remaining complaints in its third issue as challenging the underlying foundational data relied upon by Vinson and Wilkerson. *See Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) ("The substance of the [expert's] testimony must be considered. . . . The

underlying data should be independently evaluated in determining if the opinion itself is reliable."). In this regard, Chrysler's complaints merge with a legal sufficiency type analysis for lost profits damages. Once a plaintiff has chosen a particular methodology of evaluation, "recovery of lost profits must be predicated on one complete calculation." *Holt Atherton*, 835 S.W.2d at 85.

The amount of the loss must be proven by competent evidence with "reasonable certainty" by whatever method is chosen, but the rule regarding such proof is intended to be "flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex. 1994) (reaffirming *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 425–26, 115 S.W.2d 1097, 1098–99 (1938)). What constitutes reasonably certain evidence of lost profits is a "fact intensive determination." *Holt Atherton*, 835 S.W.2d at 85. At a minimum, opinions or estimates of lost profits must be based upon objective facts, figures, or data from which the amount of lost profits may be ascertained. *Springs Window Fashions Div., Inc. v. The Blind Maker, Inc.*, 184 S.W.3d 840, 884–85 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.) (op. on reh'g). Where estimates are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery is not prohibited simply because the enterprise is new. *Tex. Instruments, Inc.,* 877 S.W.2d at 280. It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery. *Id.*

## 1. Reliance on "Planning Potential"

In November 2001, before the opening of the dealership, Chrysler prepared and Mr. Manuel signed a document introduced into evidence and referred to as a DAP-3, which projected net profits for the first year of operation of the South Arlington dealership based upon the number of units Chrysler estimated for anticipated sales during the first year of actual operation. Chrysler now says that its estimate is "not reliable" and should not have been used by Manuel's experts to project sales. However, Van Gray, Chrysler's own national dealer placement manager responsible for placing, planning, and relocating dealerships, testified that planning potential is a common methodology prepared and used by automobile manufacturers. In a new "green field market" such as South Arlington, it was the "best number" available to capitalize and plan a dealership. In an established market, he said, planning potential would be similar to minimum sales responsibility. Gray further testified that Chrysler performs extensive market research as to where dealerships are to be located and as to what the planning potentials should be. Manuel's experts accepted that Chrysler had properly evaluated the market and the resulting anticipated sales based upon data researched by its market research company, Urban Sciences. They testified that planning potential is consistently used as an industry standard and concluded that it was reasonable to use the planning potential assigned in the AESSA by Chrysler itself as the estimate for sales of new vehicles for that year

by the dealership. Thus, the experts' reliance on Chrysler's planning potential did not render their opinions unreliable.

### 2. Comparable Dealership

Chrysler's expert (1) criticized Manuel's experts' use of Manuel's Richardson dealership's operation for 2001 as a comparable dealership by which to ascertain the new dealership's anticipated net profits for that year, (2) thought that Manuel's experts should have used subsequent actual years of operation for the new dealership, and (3) believed that Chrysler's number of units of 1076 was "too high" to use as estimated actual sales for that year. Manuel's experts, Vinson and Wilkerson, testified that they forecast lost profits based upon the Richardson dealership during the same time period because it was under Manuel's same experienced ownership and management in the same year that the South Arlington dealership was unable to open, because it sold two lines made by Chrysler, as did the South Arlington dealership, and because the demographics were comparable. Vinson and Wilkerson testified that they chose a dealership owned and managed by Manuel because using other dealerships would inject too many uncertainties and extraneous variables into the comparison. Chrysler's dealer placement manager, Van Gray, agreed that management by the dealer-principal is the most important factor in the profitability of a dealership.

Additionally, Vinson and Wilkerson testified that the Richardson dealership and Manuel's West Loop Dodge dealership were the only two of Manuel's

dealerships that they could have used for the year in question. They did not use the West Loop Dodge dealership in Fort Worth because it sold other lines of vehicles not manufactured by Chrysler, and it would have been extremely difficult to separate out the expenses and revenues attributable to Chrysler vehicles. They did not use Manuel's Lancaster dealership as a basis for comparison because Manuel did not own that store during the relevant time period.

Chrysler also criticizes Manuel's experts' choice of using Manuel Dodge as its yardstick because that dealership sold Dodge trucks, and the Dallas-Fort Worth area is the biggest truck market in the world and more likely to be profitable for that reason. But Wilkerson testified that the gross profit per vehicle was within the same range for both dealerships. He tested the damage model by comparing it to gross profit per unit for other area dealers doing business in 2001 and concluded that the model was very conservative. We hold that the experts' reliance on the Richardson dealership as the most comparable dealership did not render their opinions unreliable.

### 3. Applicable time period

Chrysler's argument that Vinson and Wilkerson should have used subsequent years of the South Arlington dealership's actual operation versus Manuel's damage model based on the 2001 period during which the dealership was delayed in opening was arguably the most contentious subject of the trial as to damages. The dealership opened in February of 2002. However, both Chrysler's and Manuel's witnesses agreed that the years of 2000 and 2001 were

61

exceptionally great years for Chrysler sales in the Dallas/Fort Worth area, whereas the significant downturn in the automobile market began in 2002, when registrations for Chrysler vehicles declined by 20 percent and profit for all dealers fell $8.2 million. The downturn was continuing at the time of trial. The South Arlington dealership had a loss of $482,000 in 2002. But Manuel's experts testified that looking at actual performance in 2002 would not accurately reflect how the dealership would have performed in 2001. Wilkerson testified that the difference between actual and projected sales was $1.1 million.

Each of these areas of contention was hotly disputed. We cannot say that that the trial court abused its discretion in admitting the expert testimony on this record. *See Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (stating trial court's determination of reliability of expert's opinion reviewed for abuse of discretion). Chrysler's own estimate, reflected in its DAP-3 for Manuel's South Arlington dealership's net profit for its first year of operation, was $702,674. The DAP-3 listed as "fixed expenses" a salary of $240,000 for Tommy Manuel and $540,000 in rent to him for a total of $780,000 to Tommy Manuel, personally. The "actual damages" of $370,668.50 awarded by the trial court were well within the range of Chrysler's own estimate of net profits as well as those of Manuel's witnesses.

Moreover, even if there was an error in admission of the expert testimony, it was harmless. The trial court's finding as to damages is supported by the evidence as to the amounts for rental and salary estimated to be paid to Mr.

Manuel by the dealership, which Vinson testified could be considered either as added to net profit or as fixed expense. *See Springs Window Fashions*, 184 S.W.3d at 887 (holding evidence—also provided by Vinson—that significant portion of net income was distributed to corporation's owner as compensation and benefits constituted evidence supporting award for lost profits for business otherwise operating at a loss) (citing *Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co.*, 839 F. 2d 1009, 1014 (4th Cir. 1988) (explaining concept in context of a professional corporation, which would otherwise never be able to show lost profits because its net income for tax purposes is usually near zero even if shareholders are earning large incomes)). Accordingly, we overrule Chrysler's third issue.

## VI. PREJUDGMENT INTEREST

In its final judgment, the trial court awarded Manuel damages of $370,668.50 plus prejudgment interest of $126,425.88, calculated at the per diem rate of $83.78 and representing "prejudgment interest on past damages having accrued at the lawful rate of eight and one-quarter percent (8.25%) per annum from January 12, 2003 until the date of this judgment." Chrysler contends in its fourth issue that the trial court erred in miscalculating the amount of prejudgment interest because it used an incorrect date of accrual (180 days after the date Chrysler received the first of two notices of a claim on July 16, 2002), incorrectly granting Manuel more than $35,000 in unearned prejudgment interest.

For a breach-of-contract claim, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex. 1998). A claim "is a demand for compensation or assertion of a right to be paid." *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 785 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.). A claim need not demand an exact amount or list every element of damage. *Id*. "The abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest; but the de novo standard applies to the trial court's application of the law to the facts." *Id.*; *see also Figueroa v. Davis,* 318 S.W.3d 53, 66 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Chrysler does not contest the trial court's finding of fact that Chrysler received two written notices from Manuel, one on July 16, 2002, and the other on May 31, 2004. Chrysler's contention is that the first time it had notice of any claim against it for damages for breach of the AESSA or Settlement Agreement was Manuel's May 31, 2004 demand letter and that the July 16, 2002 written notice was for an entirely different claim on which Manuel did not prevail in the trial court. Therefore, Chrysler argues that the written notice of that other claim cannot constitute the date from which prejudgment interest was to run.

In the July 16, 2002 letter, Manuel asserted that Chrysler had orally agreed at the June 14, 2000 strategy meeting to dismiss its appeal in federal court and

64

attempt to negotiate a settlement with Meador while Manuel sued Meador in state court for damages as a result of Meador's protest and that the Chrysler representatives present at the meeting "unanimously agreed" to reimburse Manuel for Manuel's legal fees and expenses.

Pursuant to the alleged agreement reached at the meeting, Manuel filed suit against Meador in Tarrant County District Court on July 12, 2000. Manuel continued the state court suit against Meador to a conclusion, claiming breach of contract, fraud, and promissory estoppel, and seeking damages for lost profits, lost income, loss of opportunity, rental and salary.[29] Manuel eventually agreed to submit the case against Meador to binding arbitration, pursuant to which a take-nothing judgment was rendered against Manuel in June 2002.

Tommy Manuel testified that he hand-delivered a brown envelope to the Dallas zone manager containing his letter demand of July 16, 2002, together with documents consisting of hourly billings by Manuel's attorney and his expert in that case, for reimbursement by Chrysler of his attorney's fees and expenses incurred in connection with his state court litigation against Meador. Chrysler denied any such agreement to reimburse Manuel for attorney's fees and expenses in the state court litigation. After a series of discussions and repeated oral demands by Manuel to Chrysler representatives, Chrysler notified Manuel by

---

[29]Contemporaneously with settling Meador's protest in late September or early October 2001, Chrysler offered to reimburse Manuel's attorney's fees in connection with the suit against Meador if Manuel would immediately drop the suit against Meador, which offer Manuel summarily rejected.

65

a February 26, 2004 letter that Chrysler would not meet the demand for the attorney's fees and expenses.[30]

The second demand letter of May 21, 2004, which Chrysler contends constitutes the only "written notice" of Manuel's claim against Chrysler, reiterated Manuel's claim that Chrysler had agreed to pay his attorney's fees and expenses in prosecuting the suit in state court against Meador. But the second letter also made demand for payment of the damages that Manuel had sustained as the result of the delay in opening the South Arlington dealership, including lost profits.

Manuel relies upon *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* in which the supreme court held that a stand-still agreement tolling the running of limitations for filing of a suit against Johnson & Higgins pending resolution of other litigation, rather than a later formal DTPA demand letter, was sufficient written notice of a claim against Johnson & Higgins for purposes of accrual of prejudgment interest. *See* 962 S.W.2d at 531. In particular, Manuel cites language of the court noting that at the time of the stand-still agreement, Johnson & Higgins had sufficient information to obtain a settlement without incurring any prejudgment interest and that it was not necessary that the document give specific notice to the other party, so long as it demands

---

[30]Manuel did not prevail on its claim for those attorney's fees and expenses in this case in the trial court and has not pursued recovery of those amounts by cross-appeal.

66

compensation or asserts a right to payment. *See id.* Manuel argues that the July 16, 2002 letter similarly sufficiently asserted his right to payment and points to the documents attached to that letter, which he describes as including documentation of other damages, including lost profits, as well as attorney's fee statements and expert witness expenses. He also refers to testimony of a Chrysler representative about possible settlement options with Manuel, including damages of over two million dollars based upon that witness's own review of the July 16, 2002 demand letter.

We do not find *Johnson & Higgins* to be analogous to this case for several reasons. First, the standstill agreement and the later DTPA letter in that case involved the same claim against Johnson & Higgins, not two separate claims as in this case. Secondly, the other litigation was ongoing at the time the standstill agreement was entered into and arose from the same occurrence, so that Johnson & Higgins had ample notice of the nature of the claim. Thirdly, as the supreme court pointed out, the "standstill agreement plainly says that 'Kenneco asserts that, to the extent underwriters are found not to be liable [in the federal action] . . . , J & H is liable to Kenneco for the amounts which Kenneco has claimed under the Policy." Through the specific language of the standstill agreement, itself, it was clear that Kenneco was asserting a right to be paid for the same amounts claimed in the federal suit. Thus, Johnson & Higgins had sufficient information at that time to obtain a settlement without incurring any prejudgment interest at all. *See Owens–Illinois, Inc. v. Estate of Burt*, 897

67

S.W.2d 765, 769 (Tex. 1995) ("[A] defendant must have notice and an opportunity to settle a claim.").

In contrast, this case involved two separate claims under two different contracts entered into, if at all, at different times and related to different occurrences and suits. We agree with Chrysler that the final judgment used the wrong date from which to calculate prejudgment interest. The subject of the letter of July 16, 2002, used by the court as the start date is not the claim on which Manuel prevailed, and we can find no mention in that letter or in the accompanying documentation that can be interpreted even to suggest a right to damages against Chrysler upon which this suit was based. Prejudgment interest cannot be based on an unrelated claim arising from a different alleged contract (the alleged oral agreement of June 14, 2000), made under entirely different circumstances (the strategy meeting of Chrysler and Manuel and their respective lawyers), and which was not a part of the contracts that were the basis of this lawsuit. The May 27, 2004 demand letter for damages, which expressly references and demands damages for breach of the AESSA and Settlement Agreement against Chrysler, is the correct date of written notice. The date of the later demand letter was less then 180 days beforer Manuel filed this suit on June 9, 2004. Therefore, the accrual date for purposes of calculating prejudgment interest is June 9, 2004, the date on which Manuel filed this suit. *See Johnson & Higgins*, 962 S.W.2d at 532. We sustain Chrysler's fourth issue. Calculating an 8.25% rate on $370,668.50 from June 9, 2004 to May 31, 2007 gives a total of

$90,985.08. We modify the judgment to instead award only that amount of prejudgment interest.

## VII. ATTORNEY'S FEES

In his cross-appeal, Manuel contends in four issues that the trial court erred by failing to award him trial and appellate attorney's fees. Chrysler responds that the trial court did not err because Michigan law applies and does not permit recovery of attorney's fees for breach of contract actions, because the AESSA prohibits recovery of attorney's fees, and because an award of appellate attorney's fees is not mandatory.

A party can recover attorney's fees under civil practice and remedies code chapter 38 if the claim is one listed in section 38.001, such as for breach of contract, and if the party (1) is represented by an attorney, (2) presented his or her claim to the opposing party or that party's duly authorized agent, and (3) the opposing party did not tender the just amount owed within thirty days. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, .002 (West 2008). If all of the statutory elements are established and there is proof of the reasonableness of the fees, an award of fees under section 38.001 is mandatory. *See AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 516 (Tex. App.—Fort Worth 2009, no pet.).

### A. Trial Attorney's Fees

Chrysler does not dispute whether Manuel established each of the statutory elements but instead contends that Manuel may not recover attorney's

fees for other legal reasons. First, Chrysler argues that Michigan law applies and that Michigan law does not permit the recovery of attorney's fees in breach of contract actions. However, Chrysler did not file a motion or otherwise request that the trial court take judicial notice of Michigan law until after the trial. While we do not hold that a motion seeking judicial notice of the law of another state will always be untimely if filed after trial, Chrysler's posttrial motion was untimely in this case. Choice-of-law matters may be waived, and we hold that Chrysler waived its choice-of-law complaint in this case by failing to raise the matter before trial, by failing to object to the admission of evidence at trial concerning Manuel's attorney's fees, and by cross-examining Manuel's attorney about the segregation of attorney's fees, all of which are inconsistent with Chrysler's appellate contention that Michigan law prevents the recovery of attorney's fees in this case.[31] *See Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex.

---

[31]One of our sister courts of appeals explained this rule as follows:

> A court may take judicial notice of the laws of another jurisdiction at any point in a proceeding. The issue of a choice-of-law determination is distinct from the court's power to generally take judicial notice of a foreign state's law. Thus, the mere fact that the court may take judicial notice of foreign laws does not mean that choice-of-law issues may be raised at any point in the proceeding. *A preliminary motion is, therefore, necessary to assure the application of the laws of another jurisdiction.* The court may undertake a choice of law analysis sua sponte, but rule [of civil procedure] 202 does not compel this action.

*Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 769 (Tex. App.—Corpus Christi 1999, pet. denied) (citations omitted) (emphasis added).

70

1993) (holding party waived application of maritime law to case "by failing to object to evidence and jury questions regarding damages which are not recoverable under maritime law"); *Burlington N. & Santa Fe Ry. Co. v. Gunderson, Inc.*, 235 S.W.3d 287, 290 (Tex. App.—Fort Worth 2007, pet. withdrawn) (holding trial court permitted to presume Texas and other state's law similar because party failed to file motion requesting judicial notice of other state's law).

Chrysler also argues that the AESSA's limitation-of-damages provision bars recovery of Manuel's attorney's fees because it provides that the non-breaching party's sole remedy will be out-of-pocket expenses that cannot be mitigated. Chrysler reasons that Manuel waived any claims for other damages and that attorney's fees are incidental damages. But Texas law provides that attorney's fees are more in the nature of costs than damages. *See, e.g., Alma Grp., L.L.C. v. Palmer*, 143 S.W.3d 840, 846 (Tex. App.—Corpus Christi 2004, pet. denied); *see also Heliflight, Inc. v. Bell/Agusta Aerospace Co., LLC*, No. 4:06-CV-425-A, 2007 WL 4373259, at *2 (N.D. Tex. Dec. 12, 2007) (mem. op.). The AESSA does not purport to prohibit recovery of costs or attorney's fees in state court litigation. Therefore, we hold that the AESSA does not prohibit the recovery of Manuel's attorney's fees.

Chrysler next argues that the trial court properly denied Manuel's request for attorney's fees because Manuel failed to segregate his attorney's fees between those incurred prosecuting claims for which attorney's fees are

71

recoverable and those incurred prosecuting claims for which attorney's fees are not recoverable. To support its contention, Chrysler relies on *Green Int'l, Inc.*, 951 S.W.2d at 389, in which the supreme court stated: "A failure to segregate attorney's fees in a case containing multiple causes of action, only some of which entitle the recovery of attorney's fees, can result in the recovery of zero attorney's fees." However, this statement from *Green Int'l, Inc.* has been characterized as dicta and is inconsistent with a subsequent supreme court opinion which holds that the failure to segregate attorney's fees does not bar all recovery of attorney's fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) ("Chapa's failure to segregate her attorney's fees does not mean she cannot recover any. Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be."); *see also Air Routing Int'l Corp. (Canada) v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 693 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding statement in *Green* concerning nonrecovery of fees for failure to segregate is nonbinding dicta). Under *Chapa*, remand is the appropriate remedy so that Manuel may offer evidence of the segregated amount of reasonable and necessary attorney's fees. *See Chapa*, 212 S.W.3d at 314.

As mentioned, Chrysler does not contend on appeal that Manuel failed to establish any of the section 38.001 or 38.002 requirements, and it appears from our review of the record that Manuel presented evidence of each statutory requirement. Indeed, Manuel presented evidence that reasonable and

necessary attorney's fees in this case exceeded $480,000 through trial, with at least another $125,000 for an appeal through the supreme court. Thus, even assuming that Manuel's attorney fee evidence consisted only of unsegregated fees, the trial court erred by failing to award him any attorney's fees. *See AMX Enters., L.L.P.*, 283 S.W.3d at 516 (stating section 38.001 fee award mandatory if statutory elements met and proof of reasonableness presented). We therefore sustain Manuel's first three issues and remand this case for a new trial concerning the segregated amount of reasonable and necessary attorney's fees for Manuel's breach of contract claim.

## B. Appellate Attorney's Fees

Manuel contends in his final issue that the trial court erred by failing to award him any appellate attorney's fees, arguing that if an award of trial attorney's fees is mandatory under section 38.001, an award of appellate attorney's fees is likewise mandatory. *See End Users, Inc. v. Sys. Supply For End Users, Inc.*, No. 14-06-00833-CV, 2007 WL 2790379, at *6 (Tex. App.—Houston [14th Dist.] Sept. 27, 2007, no pet.) (mem. op.) (citing *Lee v. Perez*, 120 S.W.3d 463, 469 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding appellate attorney's fees mandatory if trial fees mandatory under section 38.001). Chrysler, citing several cases, responds that the factfinder may award appellate attorney's fees but is not required to do so. *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 221 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also Hunsucker v. Fustok*, 238 S.W.3d 421, 431 (Tex. App.—Houston [1st

73

Dist.] 2007, no pet.); *Clements v. Minn. Life Ins. Co.*, 176 S.W.3d 258, 265 (Tex. App.—Houston [1st Dist.] 2004, no pet.), *superseded by statute on other grounds as recognized by State Farm Life Ins. Co. v. Martinez*, 216 S.W.3d 799, 804 (Tex. 2007); *Neal v. SMC Corp.*, 99 S.W.3d 813, 818 (Tex. App.—Dallas 2003, no pet.); *Olivares v. Porter Poultry & Egg Co.*, 523 S.W.2d 726, 732 (Tex. Civ. App.—San Antonio 1975, no writ).

Although Chrysler correctly cites the general rule that the factfinder may but is not required to award appellate attorney's fees, none of Chrysler's cases specifically addresses the scenario present here—whether appellate attorney's fees are mandatory when trial attorney's fees are mandatory under section 38.001 of the civil practice and remedies code. The *Anderson* court, although it stated the general rule, held earlier in the opinion that the fee claimant could not prevail on its contract claim, meaning there was no basis for the recovery of *any* attorney's fees. *See* 44 S.W.3d at 221; *cf. Lee*, 120 S.W.3d at 469 n.27 (distinguishing and declining to follow *Anderson*). *Hunsucker* concerned appellate attorney's fees for an appeal of an order dismissing a medical malpractice suit for failure to file an expert report, *see* 238 S.W.3d at 423–24, 431, and *Clements* addressed an intervenor's attorney's fees under the insurance code. *See* 176 S.W.3d at 265–66. Finally, the *Olivares* court rejected the appellant's contention that appellate attorney's fees for breach of contract and quantum meruit claims are never recoverable. *See* 523 S.W.2d at 732.

On the other hand, Manuel cites authority for the proposition that appellate attorney's fees are mandatory if trial attorney's fees are mandatory under section 38.001. *See End Users, Inc.*, 2007 WL 2790379, at *6. In *End Users, Inc.*, the claimant presented uncontested evidence that $30,000 was a reasonable fee for an appeal to the court of appeals and that $25,000 was a reasonable fee for an appeal to the Texas Supreme Court. *Id.* Because the evidence was uncontested, the court of appeals modified the trial court's judgment to award the uncontested amount of appellate attorney's fees. *Id.*

We agree with our sister court of appeals and hold that if an award of trial attorney's fees is mandatory under civil practice and remedies code section 38.001, an award of appellate attorney's fees is likewise mandatory. Unlike the *End Users, Inc.* court, though, we cannot simply modify the trial court's judgment concerning the award of appellate attorney's fees because the evidence concerning those fees was not conclusive. Therefore, we sustain Manuel's fourth issue but remand this case for a new trial concerning the amount of Manuel's reasonable and necessary appellate attorney's fees. *See World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 684 (Tex. App.—Fort Worth 1998, pet. denied) (remanding for consideration of appellate attorney's fees when evidence not conclusive).

## VIII. CONCLUSION

Having overruled Chrysler's first three issues and having sustained Chrysler's fourth issue, we affirm as modified the portion of the trial court's

75

judgment awarding damages to Manuel and affirm as modified the prejudgment interest awarded to Manuel.  In addition, having sustained each of Manuel's four issues, we reverse the portion of the trial court's judgment awarding no attorney's fees to Manuel and remand this case to the trial court for a new trial concerning the amount of Manuel's reasonable and necessary trial and appellate attorney's fees.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER and WALKER, JJ.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED:  February 24, 2012